IN THE UNITED STATES DISTRICT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



TALTWELL, LLC.

    Plaintiff,

v.                      Civil Action No. 3:07cv543

ZONET USA CORP.,
d/b/a/ ZONET USA, INC. and
ZONET, INC.
<u>et</u> <u>al.</u>,

    Defendant.


## MEMORANDUM OPINION

Taltwell, LLC filed this patent infringement action against Zonet USA Corp. and Zonet, Inc., alleging infringement of U.S. Patent No. RE37,660 E ("the '660 patent"). Taltwell asserts that seven of Zonet's products infringe Claims 21, 23, and 24 of the '660 patent. The parties are in agreement that construction of those claims is confined to construction of three disputed terms: (1) "couplable," (2) "credit card sized," and (3) "processor."

The parties have briefed the issue of claim construction and the Court held a hearing pursuant to <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370 (1996), at which the inventor, David Talton, testified briefly and counsel argued their respective positions on the terms at issue. Against this

1

background, the three disputed terms, and hence the claims, are accorded the constructions set forth below.

## BACKGROUND

David Talton, principal of plaintiff Taltwell, filed an initial patent application on March 20, 1990 for a credit card sized dialing device. In 1995, a continuation of this application was issued as Patent No. 3,452,342. In September 1997, Talton filed a reissue application to broaden the claims of that patent. On April 16, 2002, the reissue application was issued as the '660 patent.

The '660 patent comprises an automatic dialing system. As described in the specification, the device is capable of serving as an alternative to a telephone card or as a universal credit card. Depending on the embodiment, the device can communicate with the telephone system through audible signals or be inserted into a telephone or computer or cash register. Claims 21, 23, and 24 comprise variations of a credit card sized communications device. Zonet is a manufacturer of networking devices. The parties have agreed that seven of Zonet's products are alleged to infringe the patents-in-suit.

Each party has proposed its preferred construction of the terms at issue. The task of construction is complicated because Zonet's construction in its briefing on claim construction has evolved from the construction that Zonet presented in its claim

2

chart.[1]  However, for each of the three terms, the parties agree
upon a core construction for the claim, and ask the Court only
to resolve a single remaining dispute.

For "couplable," Taltwell argues that the construction of
the term should be "connectable whether by wired or wireless
connection."   In   its   claim   chart,   Zonet   argued   that   the
construction of this term should be "connectable by direct and
physical contact, as disclosed/defined by '660 patent."   In
briefing the claim construction, Zonet proposed that the
definition should be "capable of being physically and directly
linked, joined or connected to/physically and directly linked,
joined   or   connected,   which   does   not   include   wireless
connections."   The   parties   agree   that   "couplable"   means
"connectable," but they differ over whether couplable allows for
a wireless, non-physical connection.

The second term is "credit card sized."   Taltwell proposes
that the construction of this term should be, "having such
dimensions as to be designed for insertion into the slot or port
of   a   computer   of   corresponding   size."   Zonet's   proposed
construction in its claim chart was, "having such dimensions as
a credit card, which is about 8.56 cm x 5.4 cm, as the standard

---

[1]  While Taltwell calls attention to Zonet's inconsistencies,
Taltwell does not ask for any remedy other than that the Court
consider Zonet's inability to adhere to one definition to be yet
another reason to adopt Taltwell's proposed constructions.

size definition adopted by PCMCIA organization." In briefing the claim construction, Zonet proposed that the term mean: "The size of a credit card (85.60 mm x 53.98 mm), such that it can fit in the credit card pouch of a wallet."

The final disputed term is "processor." Taltwell proposes that the construction of this term should be "functional unit that interprets and processes instructions." In an attempt to severely narrow the claim, Zonet proposes that "processor" should be construed as a functional unit connected to a keypad. In its claim chart, Zonet's proposed formulation was "microprocessor unit having a keypad," a phrase in column 3, lines 21-22 of the specification. In briefing the claim construction, Zonet's proposed construction was "the computational core of the functional unit, which includes a keypad." The parties do not dispute the functional nature of the "processor" as described in the claims or specification, only whether such "processor" includes a keypad.

## DISCUSSION

A.       Legal Standard

The construction or interpretation of a claim is a question of law. <u>Markman v. Westview</u>, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd 517 U.S. 370 (1996). "[I]n interpreting an asserted claim, the court should look first to the intrinsic evidence of record, <u>i.e.</u>, the patent itself, including the

4

claims, the specification and, if in evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal citations and quotations omitted). The words of a claim are generally given their ordinary and customary meaning, and that, of course, refers to "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Id. at 1312-13. Claims must be read in view of the specification, which is "always highly relevant to the claim construction analysis." Id. at 1315. As Phillips instructs, the specification is usually "dispositive"; "it is the single best guide to the meaning of a disputed term." Id. The prosecution history of a patent can also be useful in providing evidence "of how the PTO and the inventor understood the patent," but, because the prosecution history "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of

the specification and thus is less useful for claim construction purposes." Id. at 1317.

If the intrinsic evidence is insufficient to resolve ambiguity in the meaning of claims, the court may rely upon extrinsic evidence to understand the technology and to construe the claims. Vitronics, 90 F.3d at 1584. "Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." Id. As the Phillips court emphasized, extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." 415 F.3d at 1317 (internal citations and quotations omitted).

Neither claim construction brief offers what is thought to be the "ordinary and customary meaning" of the disputed claim terms. Instead, the briefs define the disputed terms with reference to their contextual use in the specification and, to a lesser extent, in the claims at issue. Nor do the briefs identify a person of ordinary skill in the art. At oral argument, Taltwell's counsel suggested that the inventor might qualify as that person; although Zonet's counsel seemed not to take issue with that assertion, he declined otherwise to weigh in on the point. (Tr. of Markman Hearing at 9-10, 41.) The record reflects that Talton is an engineer with thirty years of

6

experience, largely in security systems of various kinds, including some experience in telecommunications systems. (Taltwell's Opp. to Def.'s Mot. to Dismiss Ex. 1, at ¶¶ 3-4.) However, except for that skimpy information, the record is silent as to the qualifications of the person of ordinary skill in the art whose view should inform the claim construction analysis.

Of course, "inventors are typically persons skilled in the field of invention," <u>Phillips</u>, 415 F.3d at 1313, so, if Talton had offered an explanation of the meaning of the disputed terms, that view could be considered. However, Talton offered no such explanation as part of the Markman briefing process. Nonetheless, the use of his words in the specification, the claims, and the prosecution history can be informative. Talton did not supply specific definitions in the patent and thus was not, strictly speaking, his own lexicographer. Nonetheless, his words are used in a specific context, and that context is a "highly instructive" aid to interpretation. <u>Phillips</u>, 415 F.3d at 1313-14.

The parties have presented no expert testimony and made limited reference in briefing, or their arguments, to extrinsic evidence.[2]  On this rather sparse record, the best that can be

---

[2] The only extrinsic evidence on the record is Zonet's proffer of a print out of the Wikipedia definition of a "credit card."

done is to construe the claims by assessing the disputed terms in perspective of their context in the claims, the specification, and the prosecution history.

## B.  Construction of the Claims

Each term will be assessed in turn by using the intrinsic evidence.

### 1.   Couplable

The term "couplable"[3] appears in two places in Claim 21: "a credit card sized housing insertable into a computer and couplable to a telephone network" and "f) an input/output port couplable to the computer and to the telephone network" (emphasis added).  The parties agree that "couplable" means capable of being coupled or connected.  They differ on whether the claims and specification limit "couplable" to only a physical or wired connection.

Taltwell argues that nothing in the claims, the specification, or the prosecution history limits "couplable" to

---

(Zonet's Claim Construction Br. Ex. C.)  The parties do not dispute what a credit card is or how it is sized, the only issue for which the exhibit described in note 2 could be of aid.  In addition, during the Markman hearing, at the Court's request, the inventor, David Talton, gave limited testimony about certain aspects of the specification, but did not opine as to the meaning of any of the disputed claims.

[3] In this opinion, the term is spelled as it appears in the patent.  The correct spelling is "coupleable," which means "that which may be coupled," a general definition that both parties accept.

only physical or wired connections. Zonet's argument is that "couplable" is derivative of the term "coupled," which is used in several subparagraphs in Claim 21, always to describe a physical, wired connection.

During the course of oral argument, Zonet effectively conceded that "couplable" in the claims was not limited to wired connections, by agreeing that the signal could be transmitted audibly, i.e., without wires. (Tr. of Markman Hearing at 72.) Nonetheless, Zonet continued to assert its position by arguing that, even in cases of wireless transmission, there was still a physical connection because, in describing an embodiment of the invention, the specification states that the device would be "placed against the receiver." (Id. at 74, referencing col. 4, line 14 of '660 Patent.)

The distinction that Zonet attempts to make is too fine. Having admitted that communications, and hence a connection, between the device and the telephone network can be made wirelessly through audio signals, Zonet cannot then rely on a description of a preferred embodiment to limit wireless communications to those that take place only when the device is physically adjacent to the network or computer. As Taltwell correctly pointed out at the Markman hearing, a later description in the same column, line 58, details how the phone card might alternatively be placed "over" the mouthpiece of the

9

receiver, i.e., not necessarily "against" and not necessarily physically linked to the phone.   The words of the claim, the specification, and the prosecution history amply support a construction of "couplable" that does not include a limitation to only physical or wired connections.

First, the words of the claim simply do not impose a limitation on the term "couplable."   Contrary to Zonet's argument, the use of the word "couplable" in the same claims that also use the word "coupled" does not suggest that the words must be read in tandem.   Whereas every use of the term "coupled" in Claim 21 references some internal component that is "coupled" to another internal component, the term "couplable" is used to indicate a potential connection between the device, or its input/output port, and some outside object.   The term "couplable" is not used in any other claim in the patent, but, in descriptions of the device's interactions with outside instruments, there are several references to sensing signals by means other than a direct connection, and none of those involve physical touching.   See Patent '660, Claims 1, 12, 17 ("means for sensing a dial tone…").

Nor does the specification impose any limitation on what is claimed by "couplable."   Indeed, as even Zonet has admitted, the specification includes multiple references to audible or non-wired connections.   Although at least one of these references

includes the possibility of direct physical adjacency in that the device is placed against the telephone, as already discussed, the specification also allows for the possibility that the card would be placed "over" and not "against" the receiver.   The Federal Circuit has "repeatedly warned against confining the claims to those embodiments" described in the specification and has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." Phillips, 415 F.3d at 1323.   Here, given that the specification describes the operation of the invention as something that is capable of sensing or emitting audio signals, so that a direct physical connection is not essential to its operation, the settled law precludes imposition of a wired or physical limitation on the term "couplable."

Finally, the prosecution history strongly suggests that the intent of the inventor was to make Claim 21 inclusive of, and broader than, Claim 17, which is a device that operates through sensing and emitting audible signals.   On this issue, Taltwell cites a brief in the file history wherein the inventor, Talton, distinguished his invention from prior art Hanna by pointing out that his invention did not require a hardware connection.   That brief is useful as an indication of the inventor's views of his overall invention, but it was drafted to support only Claims 1-

11

20.   However, chronologically later in the prosecution history, there is the inventor's Supplemental Declaration for Reissue Patent Specification, in which Talton describes the differences between Claim 17 and Claim 21, explaining that he believed that Claim 17 unduly limited his patent.  ("However, I believe that patent claim 17 incorporating these limitations unduly limits the patent and that the patent is therefore inoperative by reason of us claiming less than I had the right to claim in the patent.").  (Pl.'s Opening Claim Construction Br. ("Pl.'s Br.") Ex. C at 2.)  Doing little more than restating the claims of his patent, Talton's succeeding explanation is not the most illuminating, but, taken as a whole, the declaration strongly indicates that Claim 21 was intended to possess at least the audio / wireless capabilities of Claim 17.

In sum, the intrinsic evidence provides no support for Zonet's assertion of the limitation it urges on the term "couplable."  Moreover, the intrinsic evidence rather clearly shows that the invention specifically encompassed wireless, audio communications.  Indeed, Zonet, in its oral presentation at the Markman hearing actually conceded that the invention can operate through wireless communications.  For all the reasons set forth above, the term "couplable" is construed to mean capable of connection, whether wired or wireless.

12

## 2.  Credit Card Sized

Claim 21 asserts "A credit card sized communications device comprising: a credit card sized housing insertable into a computer and couplable to a telephone network, said credit card sized housing including. . . "

Notwithstanding the repetition in Claim 21 of the words "credit card" in describing the size of the invented device, Taltwell would have the Court construe the term to make no reference to a credit card, instead proposing that the term "credit card sized" mean: "[h]aving such dimensions as to be designed for insertion into the slot or port of a computer of corresponding size." (Pl.'s Br. at 7.)   Zonet has offered two proposed constructions, one which construes the claim with reference to the standard size definition of a credit card adopted by the Personal Computer Memory Card International Association ("PCMCIA"), and one which construes the claim so that it is the size of a credit card (85.60 mm x 53.98 mm), such that it can fit in the credit card pouch of a wallet.

Taltwell's principal argument is that Claim 21 can be differentiated from Claim 17 as not including the specific limitation that the case be "of a size and shape to fit the user's wallet corresponding to the size of a credit card." See '660 Patent, Claims 1, 12, and 17.   To bolster its argument, Taltwell points to Talton's Supplemental Declaration for Reissue

13

Patent Specification wherein he distinguishes Claim 21 from Claim 17, including the removal of the reference to the device's capacity to fit in a user's wallet.

The words of the claim do not provide much help in understanding what is the difference between a "credit card sized" housing or device (Claim 21) and a "credit card sized dialing device" that comprises "a case of a size to fit in a user's wallet corresponding to the size of a credit card" (Claims 1, 12, 17). While the doctrine of claim differentiation would have this Court give meaning to such differences, the claims do not make clear what "credit card sized" should mean in the absence of a wallet pocket.

The specification also does not provide a clear indication of what "credit card sized" should mean for a device that is not necessarily meant to be carried in a wallet. However, the specification does repeatedly emphasize the size of the device as akin to that of a credit card as being one of the significant innovations of the device. For example, the specification states:

> One of the most important advantages of the invention is its size. The invention would resemble the size of an average credit card and fit in a credit card pouch of a wallet. . . . Due to the wide acceptance of the

> credit card the size of the invention would
> be readily accepted and have a place in
> everyone's wallet.

'660 patent, col. 2, lns 33-35.

While Taltwell is correct that Claim 21 does not, compared to other claims, require the case to be of a size that fits into a user's wallet, Claim 21 is nonetheless a device, as are the other claims, meant to resemble, to replace, and to be the approximate size of a credit card. The claim did not by accident describe the claimed invention as a "credit card sized communications device comprising: a credit card sized housing." The removal of the specific reference to a wallet in the description of the version in Claim 21 appears to be a concession to the changes in the shape of the housing that would need to be made to accommodate a computer's slot or port. Or, it could be an oversight. In either event, Claim 21 imposes a "credit card size" limitation on the invention and does so in clear terms.

Then, the prosecution history indicates that Claim 21 is intended to be differentiated from the previous claims in part based on the removal of the reference to a wallet, but the main concern of Talton appears not to be changing the size of his device, but instead to be ensuring that his patent extended to a "communications device" beyond a "direct dialing device." The grammar of the cited declaration is odd ("First, the device has

15

been modified such that is it specifically directed [sic] a credit card sized housing insertable into a computer and couplable to a telephone network"), but the most reasonable reading of the paragraphs is that Talton was directed to a modification of his description of the <u>nature</u> of the device, not the <u>size</u> of device.

Other parts of the prosecution history also support a construction of the term "credit card sized" to have specific reference to the size of a credit card.  In briefing, Taltwell argued that distinctions between the '660 patent and Winebaum's prior art indicate that the patent examiner understood the size of the device not to be precisely limited to the size of a credit card.  (Pl.'s Br. 10-11.)  That may well be true of the examiner's understanding of what credit card sized might mean, but Talton's response to the PTO clearly indicates that he understood credit card sized to be approximately the size and shape of a credit card: "Thus, Winebaum fails to disclose a dialing device <u>the size and shape of a credit card</u> to be inserted into computer."  (Pl.'s Ex. C at TLTW 1162) (emphasis added).  The inventor's intent, demonstrated in the prosecution history and supported by the specification, was clearly to claim a device approximating the size of a credit card.

While the parties agree that some variance in the depth of the device is to be expected of a housing that would include all

16

of the elements described in the claims, it belies the plain and ordinary terms of the claim for Taltwell to claim that the dimensions of the device are bounded only by the requirements of a computer slot or port, and not by the size of a credit card. Zonet argues that its accused products are of a different length than a credit card. That, however, is not a claim construction issue. Rather, that argument addresses the question of infringement and may implicate the doctrine of equivalents, but neither party has posited that doctrine for assessment in the claim interpretative process.

For the foregoing reasons, the term "credit card sized" is construed to mean approximately credit card sized. The device does not have to meet the exact specifications of the ISO standard, but must be roughly credit card sized.

### 3. Processor

A "processor" is one of the main components in Claim 21, which details a device in which there is a central processor that is coupled to various other components. Zonet proposes to limit the term "processor" to a unit containing a keyboard. Taltwell asserts that there is no such limitation on the term. Other than one embodiment that contains a keypad, there is no record support for limiting the term "processor" to a unit that includes a keypad. Moreover, even in the embodiment that includes the keypad, the processor is not directly linked to the

17

keypad. <u>See</u> '660 patent, Fig. 1. Adopting Zonet's proposed construction would require the Court to violate the oft-cited cardinal rule that claims not be confined to an embodiment described in the specification. <u>See</u> <u>Phillips</u>, 415 F.3d at 1323 (discussed <u>supra</u>). The Court declines that invitation to sure error. The term "processor" is construed to mean a functional unit that does not include a keypad.

### CONCLUSION

For the reasons set forth above, the disputed terms in Claims 21, 23, and 24 of the '660 patent are to be construed as reflected herein.

_____/s/_____ *REP*
Senior United States District Judge

Richmond, Virginia
Date: March 28, 2008

18